

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

---

No. 02-19-00064-CV

---

SIMONE BARRON AND WALID YAMMINE, Appellants

V.

ISSAM AL SHMAISANI AND SHARON SMITH, Appellees

---

On Appeal from the 348th District Court
Tarrant County, Texas
Trial Court No. 348-264569-13

---

Before Sudderth, C.J.; and Kerr, J.[1]
Memorandum Opinion by Justice Kerr

---

[1]Justice Lee Gabriel was a member of the original panel but has since retired. Because they agree on the judgment, the two remaining justices decided the case. *See* Tex. R. App. P. 41.1(b).

## MEMORANDUM OPINION

In separate briefing raising a plethora of issues, Simone Barron and her brother Walid Yammine appeal the trial court's judgment following a jury trial concerning a real-estate transaction involving Plaintiff–Appellee Issam Al Shmaisani and (in varying roles) Defendants–Appellants and two of their siblings. Reversing the judgment below in part, we hold that the amount of attorney's fees assessed against each Appellant and awarded to Shmaisani under Chapter 12 of the Texas Civil Practice & Remedies Code must be reversed and remanded to the trial court for a new trial. We also hold that Appellee Sharon Smith—a third-party defendant below—cannot recover sanctions in the form of attorney's fees against Simone Barron and render judgment accordingly. In all other respects, we affirm the trial court's judgment.

## PARTIES[2]

*Plaintiff–Appellee Issam Al Shmaisani*: Fort Worth businessman who in late March 2012 agreed to buy certain property owned by Wahid Yammine to stop a foreclosure sale set for two days later by Wahid's lienholder David Healy. Through an option agreement, Wahid could later buy it back from Shmaisani.

*Defendant Joseph Imad[3] Yammine ("Joseph")*: Original purchaser, in 2001, of commercial properties located at 701, 705, and 709 North Main Street in Fort Worth

---

[2]We set out this guide to the parties for clarity. We intend no disrespect by using first names for Yammine family members.

that are the subject of this lawsuit (collectively, "the 701 Property"), as well as a nearby commercial property located at 717 North Main ("717 Main"), all of which secured debt that Joseph owed Wahid. At the close of evidence, Shmaisani nonsuited his claims against Joseph.

*Defendant Wahid Joseph Yammine ("Wahid")*: Resident of Lebanon who conducts his Texas real-estate dealings through his siblings, who live here. In January 2012, in the name of his dba New Frontier Financial, Wahid foreclosed on and took ownership from Joseph of 717 Main and of the 701 Property. In August 2013, some six months after Shmaisani sued Wahid and Joseph, Wahid filed for bankruptcy and ultimately received a full discharge. Wahid appealed from the trial-court judgment but dismissed his appeal without filing a brief.

*Defendant–Appellant Walid Joseph Yammine ("Wally")*: Goes by the nickname Wally, which we will use to more easily distinguish between Wahid and Walid. Wally was involved with the April 2012 closing of the Wahid–Shmaisani transaction and same-day ostensible conveyances from New Frontier/Wahid to Wally and to Wally's business BW Construction of interests in the 701 Property. On that day, Wally also received Wahid's assignment of the 701 Property repurchase option.

*Defendant–Appellant Simona Barron ("Simone")*: Also involved with the closing, and held a power of attorney for Wahid. Simone provided a recorded deed's

---

[3]Numerous documents show Joseph's middle initial as "K." The discrepancy is not legally significant here.

instrument number for attorney Michael Newman to insert into the April 2 contract between Wahid and Shmaisani; she later attempted to exercise the repurchase option on Wahid's behalf; and in 2014, she purchased assets, ostensibly including the 701 Property, from Wahid's bankruptcy estate. Simone represented herself at trial.

*Third-Party Defendant–Appellee Sharon Smith*: Fee attorney working with Stewart Title Company. Smith handled the April 2, 2012 closing of the sale to Shmaisani. The trial court directed a verdict in Smith's favor.

## BACKGROUND

**Joseph buys properties on North Main Street; Wahid forecloses on Joseph's debt to him and acquires the 701 Property in 2012.**

Joseph bought the 701 Property in August 2001. Its legal description encompasses 12 discrete lots: Lots 1 through 6 and 43 through 48 of Block 27, North Fort Worth Addition to the City of Fort Worth. The next month, Joseph bought nearby 717 Main.

On April 3, 2009, several things happened with the 701 Property:

- Joseph conveyed it to Wahid by a special warranty deed;

- Wahid simultaneously conveyed the 701 Property back to Joseph by special warranty deed; and

- To secure Joseph's $498,000 indebtedness to New Frontier, Joseph executed a deed of trust, with Lee Woodburry as trustee, on the 701 Property—a document not recorded for over two and a half years.[4]

---

[4]Conveyances of real property among the Yammine family, sometimes with delayed filings and for opaque reasons, have yielded other lawsuits that have made

4

After Joseph signed the deed of trust for New Frontier's benefit but long before it was recorded, Joseph executed a second deed of trust in January 2010 on the 701 Property, this time to secure a $300,000 loan from David Healy that matured a year later. Joseph signed a third deed of trust—the second in Healy's favor—on March 7, 2011 to secure a 12-month, $342,980 loan, again secured by the 701 Property.

Through trustee Lee Woodburry, Wahid/New Frontier later foreclosed on its liens and received trustee's deeds to the 701 Property and to 717 Main, each dated

---

their way to us. In a case from several years ago, Joseph sought unsuccessfully to avoid a deed of trust he had executed to secure a loan from a third party (Lillian Wilson, LLC) by transferring the property to Wahid four days before the deed of trust was recorded. *1901 NW 28th St. Tr. v. Lillian Wilson, LLC*, 535 S.W.3d 96, 100 (Tex. App.—Fort Worth 2017, no pet.) (affirming vexatious-litigant ruling entered against Joseph and noting, "Excluding any consideration of whether [Joseph] Yammine defrauded Lillian Wilson by securing a loan for delinquent ad valorem taxes on a property that he had previously conveyed [to Wahid], the tax lien that Tarrant County transferred to Lillian Wilson had attached to the Property before the deed of trust was recorded in June 2009.").

And in that case as well as here, Joseph repeatedly claimed to have difficulty recalling events because of a car wreck. *Id.* at 98 & n. 2 ("[Joseph] claimed to have been suffering from the effects of a different car accident when Lillian Wilson deposed him on an earlier date."). High blood pressure was added at this trial to explain Joseph's difficulty fielding questions. A question as simple as whether Joseph had ever signed documents as "Joseph K. Yammine" was met with, "I don't remember. And the reason I don't remember is that I've been in two different accidents. I've been struck with trauma, facial trauma . . . ." Wally also blamed medical issues for his own extensive memory lapses at trial, frequently invoking chemotherapy treatments and pneumonia. Wahid—a commercial-airline captain based in Lebanon—offered no medical excuses but likewise professed extraordinary difficulty recalling even basic events and documents concerning the 701 Property.

5

January 3, 2012. The 701 Property remained encumbered by the Healy liens, but 717 Main had no Healy liens against it.

**Healy schedules the 701 Property for foreclosure on April 3, 2012; the Yammines enlist Shmaisani to keep that from happening.**

Because of the unpaid and past-due Healy debt, a foreclosure sale of the 701 Property was scheduled for April 3, 2012, a Tuesday. Acting on Wahid's behalf, Simone and Joseph visited Shmaisani on Saturday, March 31, 2012, seeking to borrow money to pay off Healy and stop the foreclosure. After Shmaisani explained that he was "not a bank," Simone and Joseph suggested that Shmaisani buy the property outright and give Wahid an option to buy it back in four months. According to Shmaisani, to "kind of give [him] a good comfort level in doing the deal" Simone offered to get attorney Michael Newman—who had done earlier legal work for both Shmaisani and the Yammines—involved in the transaction.

Simone called Newman while still at Shmaisani's office and, as Shmaisani recounted at trial, explained to Newman that Shmaisani would be buying the properties that were on "Healy's foreclosure list." At trial, Simone insisted that Shmaisani was instead buying the non-Healy-burdened 717 Main.

**Simone gives Newman an instrument number to put in the sales contract, but the associated warranty deed does not match any property on Healy's foreclosure list.**

Because of the looming Tuesday foreclosure sale, the parties were "very frantic," in Newman's words, to finalize the transaction on Monday, April 2, 2012.

That morning, then, Shmaisani, Simone, Wally, and Wahid (who had flown in from Lebanon) went to Newman's office to get a contract drafted and signed. According to both Shmaisani and Newman, Simone provided Newman a warranty deed's instrument number—D201239958—for him to insert into the $535,000 sales contract. But D201239958 actually refers to 717 Main, not the 701 Property. Newman explained:

> Simone had brought a piece of paper with her -- that's all she had -- and said, "We need to draft a contract to take to the title company," so they could then proceed with the -- the closing or the sale.
>
> And Simone was just very adamant about this piece of paper [that] had a -- it referred to an instrument number, the recording of a deed in the Tarrant County deed records, and said, "We need to put a contract together. We don't have time to look anything up or research. Just put this number down. This is the instrument number to the deed for 701, 705, 709."
>
> . . . .
>
> [T]hat's what she gave me and said that that's what we need to put on the contract because that's the deed that refers to 701, 705, 709 Main Street.

Even when Newman suggested that he pull up the instrument number online, Simone responded that "she was in just such a rush, that we didn't need to do that, that we needed to hurry up and get to the title company." Newman testified that Wahid was present and everyone was "on the same agenda: We need to get this done. We need to stop the foreclosure." Newman did not recall anyone's discussing 717 Main that day.

The hastily prepared sales contract that Wahid and Shmaisani signed and that was shortly afterward taken to the title company for closing was bare-boned, as this snippet reflects:

TEXAS ASSOCIATION OF REALTORS®
COMMERCIAL CONTRACT - IMPROVED PROPERTY
USE OF THIS FORM BY PERSONS WHO ARE NOT MEMBERS OF THE TEXAS ASSOCIATION OF REALTORS IS NOT AUTHORIZED.
©Texas Association of REALTORS®, Inc. 2005

1. PARTIES: Seller agrees to sell and convey to Buyer the Property described in Paragraph 2. Buyer agrees to buy the Property from Seller for the sales price stated in Paragraph 3. The parties to this contract are:
   Seller: Wahid Yammine dba New Frontier Financial
   Address:
   Phone: _____ Fax: _____
   E-mail:
   Buyer: Issam Al Shmaisani
   Address:
   Phone: _____ Fax: _____
   E-mail:

2. PROPERTY:
   A. "Property" means that real property situated in ____Tarrant____ County, Texas at
   (address) and that is legally described on the attached Exhibit: _____ or as follows:
   As Described in Warranty Deed Dated Sept 27, 2001
   Instrument D Doc 201239958, D.R.T.C.T.

After the parties and Newman arrived at the title company following an early lunch together, Sharon Smith—a fee attorney who worked with Stewart Title—took the signed contract and began an unusually rushed closing process. Smith understood that the property being sold to Shmaisani was "the property being posted for foreclosure, which makes sense, because nothing else would be a super-rush. If it wasn't going to be lost within 24 hours, there's no way I would ask my [title] plant or my office to put forth that effort." Asked whether, in her 37 years of experience, she had "ever had someone come in and pay money to pay off a lien against a property

8

and not purchase that property," Smith replied, "Not in a commercial transaction or a foreclosure transaction, no." As Smith also testified,

> They brought us this contract. Out of due diligence, we pulled that instrument number up, and where I had heard nothing but we were working the foreclosed -- the posted foreclosure property, they did not match.
>
> At that point we went back to the parties, who were sitting in our conference room, and told them: This is not the property that is subject to foreclosure tomorrow. So if it's this property, we're not going to be closing this property on a rush order.
>
> And they go: Oh, no. That is a mistake. It is the property that's posted for foreclosure. . . . The buyer and the seller and Mr. Newman and Simone told me that it was definitely the property that was going to be foreclosed.

Smith's testimony corroborated Shmaisani, who asserted that Simone had had him believe that "this is the instrument number for what Mr. Healy was foreclosing on."

**The parties agree to Newman's writing in the 701 Property addresses on the contract, and the closing goes forward.**

After Smith had determined that the instrument number did not match anything on the foreclosure list, Smith recalled that Newman said he would "add some addresses, if that will help," and did so while Wahid and Shmaisani were present: 701, 705, and 709 Main Street.[5] Newman testified that when he wrote in the

---

[5]Although Newman omitted "North" from the written-in addresses, he testified that everyone knew that the reference was to 701, 705, and 709 North Main Street: "[T]he Yammines knew what property they owned. They knew what property that they were dealing with."

addresses on the contract, "Wahid was there. . . . [Simone] was there and fully aware of these changes, and everybody was in agreement." The first part of the contract now looked like this:

TEXAS ASSOCIATION OF REALTORS®
COMMERCIAL CONTRACT - IMPROVED PROPERTY
USE OF THIS FORM BY PERSONS WHO ARE NOT MEMBERS OF THE TEXAS ASSOCIATION OF REALTORS® IS NOT AUTHORIZED.
©Texas Association of REALTORS, Inc. 2005

1. **PARTIES:** Seller agrees to sell and convey to Buyer the Property described in Paragraph 2. Buyer agrees to buy the Property from Seller for the sales price stated in Paragraph 3. The parties to this contract are:

Seller: Wahid Yammine d.b.a New Frontier Financial
Address:
Phone: _____ Fax: _____
E-mail:
Buyer: Issam Al Shmaisani
Address:
Phone: _____ Fax: _____
E-mail:

2. **PROPERTY:**

A. "Property" means that real property situated in _____ Tarrant _____ County, Texas at 701, 705, 709 Main St. Ft Worth
(address) and that is legally described on the attached Exhibit _____ or as follows:
As Described in Warranty Deed Dated Sept 27, 2001
Instrument D2001 2012391958, DRTCT.

From Shmaisani's $535,000 consideration, Healy's liens against the 701 Property were paid off and released the same day. Smith explained that taking care of Healy was the "biggest concern, because if we didn't take care of him, it didn't matter; the property would be gone the next morning on the courthouse steps."

At closing, Wahid executed a warranty deed describing the conveyed property as "See Attached Exhibit 'A'" although no Exhibit A was attached at the time. Instead, due to the transaction's rushed nature, everyone involved agreed that the legal description would be added after the title company completed its property report. According to Newman, everyone was "comfortable" in letting the title company

10

finish its work and later "attach the legal description based on the research that they did." Newman testified that Smith had told everyone present that "once they had the title work finished, they would attach the legal description that they ultimately [came] up with, and everybody understood and agreed and allowed her to proceed in that fashion."

Shmaisani said the same thing: they had all understood and agreed that they "were leaving that date without exhibits because the title company was, again, still trying to figure out what is residential and what is commercial,[6] and legal descriptions or exhibits would follow, and we all had that understanding. None of us had a problem with it." Shmaisani answered, "Absolutely," when asked if he had understood that "the exhibit that was going to be attached to that deed would have a description of all the commercial property on which Mr. Healy had a lien"—which would have included all 12 of the 701 Property lots but not 717 Main. Both Shmaisani and Wahid signed the requisite settlement statement, which showed the property addresses as "701 N. Main Street, Fort Worth, TX 76164, 705 N. Main Street, Fort Worth, TX 76164; 709 N. Main, Fort Worth, TX 76164."

Also on April 2, Shmaisani and Wahid executed an option agreement giving Wahid until August 2, 2012 to buy back, for $685,000, property described on "Exhibit

---

[6]Healy had a lien against residential property that was also on the foreclosure list, but Shmaisani was not interested in buying anything other than commercial property from Wahid.

A," which, when finalized and recorded, mirrored the Exhibit A ultimately attached to the warranty deed.

**The deed's Exhibit A legal description is added after the postclosing title work.**

With the flurry of Healy-focused activity at an end on April 2, Smith's office turned its attention to finalizing the legal description for the warranty deed's Exhibit A, a process that included ensuring that Shmaisani had acquired only commercial lots. To that end, Smith, her escrow assistant Laura White, and Newman corresponded by email over several days. Smith and White were initially confused about whether Lots 43 through 48 of the 701 Property were residential (they weren't), with Smith's having understood at first that those six lots weren't being conveyed to Shmaisani for that reason. Newman corrected Smith by pointing her to the deeds of trust for "all of the lots." In that same email, Newman informed Smith that he had "had lunch with [Wally] and Joseph today and they agreed with the lots I told you." At trial, in response to being asked if that email looked like "they had at least expressed their consent that all [12] lots were to be included and attached on Exhibit A," Newman said, "I mean, that's always been the understanding the whole week" of April 2, 2012. Newman later instructed White in an April 5 email: "The deed needs to contain the legals for 701, 705 & 709 Main which is lots 1-6 & 43-48."

When Exhibit A was finalized and the deed recorded in May 2012, the description matched the entire 701 Property. Newman testified that throughout

12

various and numerous meetings up through the fall of 2012 with Simone, and several meetings with Wally and Joseph, none of them claimed that the warranty deed to Shmaisani was wrong and should instead have described 717 Main; "no one ha[d] ever mentioned that."

The option agreement—which Newman recorded on June 13, 2012—also attached the 12-lot 701 Property legal description as its Exhibit A. Simone acknowledged that Newman gave her a copy of the option and that it "specifically describe[d] the 701, 705, and 709 North Main properties." Wahid testified that he had learned about Exhibit A maybe two to three weeks after closing and definitely knew about it by August 2012. Neither of them complained.

**After the closing, Wahid and Wally continue to assert interests in the 701 Property; Wally "re-forecloses" on Wahid's debt to Joseph.**

Wahid and Wally were not through with the 701 Property even after Wahid sold it to Shmaisani on April 2. Later that same day—around 5:00 or 5:30 p.m.—and using a different notary, Wahid purported to convey an undivided 50% interest in the 701 Property to Wally and to convey Lots 5 and 6 to BW Construction, Wally's dba. These two deeds were recorded in October 2012, after the option agreement had expired.

And even though the option was expressly nontransferrable, also on April 2 and using yet another notary, Wahid assigned it to Wally, an assignment that—like the option agreement itself—contained the 701 Property legal description. This

13

assignment stayed out of the official records until Wahid submitted it for recording in late August 2012, also after the option had expired.

More was to come: in late August 2012, a July 3, 2012 trustee's deed executed by a "W. Yammine" as trustee was recorded, reflecting a foreclosure sale after Joseph failed to pay his April 2009 $498,000 debt to New Frontier/Wahid. This trustee's deed has a whiff of déjà vu: New Frontier/Wahid (through the real trustee, Woodburry) had already foreclosed on the 701 Property in January, which is how Wahid had title in the first place and could therefore convey the 701 Property to Shmaisani in April.[7] Additionally, the W. Yammine trustee's deed falsely recited that a deed of trust dated April 3, 2009 was delivered to W. Yammine as trustee on that date and "recorded December 30, 2011 under Tarrant County Clerk's file

---

[7]When Wally was questioned about whether it was his "W. Yammine" signature on the July 2012 deed, he said, "I don't remember if it's mine, you know," and, "I'm not sure. Let me see. No, I'm not sure. I can't see very well. Sorry. It's strong cancer chemo," something he invoked multiple times in claiming a lack of memory. Asked by his own lawyer whether he had "anything to do with" that document, Wally responded, "I don't remember. I -- my chemo, cancer chemo . . . ."

As for Wahid, at trial he claimed total ignorance of the "W. Yammine" July 2012 trustee's deed. This sequence of events echoes those in still another appeal involving Wahid, which originated in our court before being transferred. *Yammine v. HDH Fin., LLC*, No. 07-14-00169-CV, 2015 WL 3750339, at *1 (Tex. App.—Amarillo June 12, 2015, pet. denied) (mem. op.) ("The dispute arose after Wahid released liens attaching to various parcels of realty. The liens arose from deeds of trust executed in his favor by the landowner. After the liens were released, the landowner sold the property to HDH via warranty deeds. After the latter transaction occurred, the trustee under the prior deeds of trust conveyed to Wahid title to the realty. HDH then sued Wahid to remove the cloud on its title.").

#D211315107"—but that was the instrument number and date associated with the Woodburry deed of trust.

**Simone exercises Wahid's option to reacquire the 701 Property, although the purchase never materializes.**

During the time before the Wahid–Wally/BW deeds, the option assignment, or the "re-foreclosure" trustee's deed was filed of record, Wahid's repurchase option faced an August 2, 2012 deadline. Despite Wahid's having assigned the option to Wally in April, Simone went to Newman's office on July 31, 2012 and signed, as Wahid's agent under a power of attorney, a document stating that Wahid was exercising his option "concerning the property located at 701, 701 [sic], 705 and 709 N. Main Street, Fort Worth, Tarrant County, Texas." And on the option period's final day, Simone—again acting for Wahid—recorded his "notice of exercise of option." That notice attached the same legal description of the 701 Property as the option agreement's Exhibit A, which in turn was the same legal description as the Wahid–Shmaisani warranty deed's Exhibit A.

The option was never consummated, and Shmaisani remained as the record owner of the 701 Property—or so he thought, until February 14, 2013.

**Shmaisani finds out about Wahid's and Wally's postclosing mis-"deeds."**

On that 2013 Valentine's Day, Shmaisani visited the Tarrant County Appraisal District offices and not only learned of Wahid's April 2 conveyances to Wally and BW Construction but also saw why his recent online property search had revealed that in

the summer of 2012, the 701 Property's ownership had been changed in the official records from him to New Frontier. That change was of course based on "W. Yammine"'s having foreclosed Joseph's earlier debt to Wahid, for the second time, by a different trustee—and allegedly with no knowledge whatsoever on Wahid's part.

**Litigation ensues.**

Shmaisani sued Wahid and Joseph almost immediately. Six months later, in August 2013, things came to a grinding halt when Wahid filed bankruptcy.[8] The automatic stay was eventually lifted and this litigation continued, but among the Yammines the 701 Property remained a hot potato (or a pea under a shell, depending on one's point of view). In the bankruptcy proceeding, Wahid had listed Lots 1 through 6 of the 701 Property among his bankruptcy estate's three pages of real-property interests held during the statutory pre-petition period, all of which he valued collectively at over $2 million. In October 2014, the bankruptcy court entered an order approving the sale of all of Wahid's real-estate assets to Simone for—$10,000.

The bankruptcy court apparently approved this massive discount because of uncertainty over whether Wahid owned all or any part of the assets, noting in its order

---

[8]Wally himself had filed bankruptcy earlier, around August 2012, initially listing among his estate's personal-property assets the assigned option agreement and, in amended schedules, a 50% interest in the 701 Property. Soon after we heard oral argument, Wally filed bankruptcy again, triggering an abatement of this appeal until Shmaisani obtained an order lifting the automatic stay. Brother Joseph was also no stranger to serial bankruptcy proceedings, unable to recall at trial even whether he had filed bankruptcy fewer or more than five times.

that the court "has not made and is not making any determination that the [Bankruptcy] Estate has any interest in the Scheduled [Real] Property listed on Amended Schedule A." Simone promptly transferred Lots 1 through 6 of the 701 Property to an entity she controlled called the "701, 705, & 709 N. Main Street Trust" although that October 2014 warranty deed was not recorded until December 2015, over two years after this lawsuit started.[9]

Shmaisani amended his petition in May 2015 to add Wally and Simone as defendants. Shortly afterward, Wahid filed a third-party action against Smith and Stewart Title. Wally later filed his own counterclaims against Smith, Stewart Title, and Shmaisani to quiet title, for real-estate fraud, and for violations of the Texas Theft Liability Act.[10] *See* Tex. Civ. Prac. & Rem. Code Ann. §§ 134.001–.005.

In December 2016, Simone filed a voluntary Chapter 13 bankruptcy petition, putting yet another halt to the trial-court proceedings. On Shmaisani's motion to lift stay, a motion that is not in our record, the bankruptcy court ordered that the "stay afforded by 11 U.S.C. § 362 is hereby terminated with respect to [Shmaisani] in order

---

[9]Simone testified that she was the trustee of that trust and believes that she was also the trust's beneficiary, but that the trust had been dissolved and its assets "went back to" her by way of some document she could not describe at trial; nor could she recall the attorney who had created the trust documents for her.

[10]Stewart Title won summary judgment on Wally's claims against it, and Wahid later dismissed his claims against Stewart Title. Smith was thus the only third-party defendant at trial. The trial court directed a verdict in her favor, and no one has complained to us about that ruling.

to pursue state court litigation in a matter entitled Issam Al Shmaisani v. Wahid J. Yammine, et al, 348-264569-13 and related, *inter alia*, to" the 701 Property.

Shmaisani later supplemented his petition against Wahid and Wally to assert waiver, estoppel, and ratification as bars to Wahid's or Wally's attempts to "reform, modify or void the deed conveying" the 701 Property.

## JURY VERDICT; JUDGMENT

At the end of a six-day trial, the jury returned a unanimous verdict finding that:

- Wahid and Shmaisani agreed that Smith was authorized to add an Exhibit A legal description of the 701 Property after postclosing title work was completed (Question 1);

- Wahid ratified the April 2 conveyance of the 701 Property to Shmaisani (Question 2); waived his right to contest the Exhibit A legal description that was added to the warranty deed (Question 3); and was estopped from asserting that the warranty deed did not convey the 701 Property, as described in Exhibit A, to Shmaisani (Question 4);

- Shmaisani did not obtain the deed to the 701 Property by fraud (Question 6);

- Shmaisani was a good-faith purchaser for value without notice of Wahid's near-contemporaneous deeds to Wally and to BW Construction (Question 7);

- Wally was not a good-faith purchaser for value without notice of the deed conveying the 701 Property to Shmaisani (Question 8);

- Wahid fraudulently executed, and Wally fraudulently caused to be filed, the April 2 warranty deeds to Wally (50% interest in the 701 Property) and to BW Construction (Lots 5 and 6) (Questions 9(a) and (b));

- Wally fraudulently executed and caused to be filed the W. Yammine July 2012 trustee's deed conveying the 701 Property to New Frontier/Wahid (Question 9(c)); and

18

- Simone fraudulently executed and caused to be filed the deed conveying Lots 1 through 6 to the "701, 705, and 709 N. Main Street Trust." (Question 9(d))

After a number of postverdict motions went back and forth, including ones involving Shmaisani's attorney's fees and Smith's motion for sanctions against Wahid under Rule 13 of the Texas Rules of Civil Procedure, the trial court entered its final judgment in November 2018, ordering that Shmaisani recover—

- title to and possession of the 701 Property;

- nothing from Wahid (because of his discharge in bankruptcy);

- $30,000 from Wally for three fraudulent property-records filings;

- $10,000 from Simone for her fraudulent property-records filing;

- $120,000 in reasonable and necessary attorneys' fees from Wally, together with conditional appellate attorneys' fees, under the Fraudulent Lien Act, Chapter 12 of the Texas Civil Practice & Remedies Code (CPRC); and

- $40,000 in reasonable and necessary attorneys' fees under Chapter 12 from Simone, plus conditional appellate attorneys' fees.

As to Smith's Rule 13 motion against Wahid, the trial court awarded Smith $21,265 as reasonable and necessary attorneys' fees, but against Simone and not Wahid. The trial court also ordered that "Defendants, as Counterclaimants, take nothing by their counterclaims" against Shmaisani. This appeal followed.

### ISSUES ON APPEAL

Simone has raised five issues, which we paraphrase:

1. The Wahid–Shmaisani warranty deed is void because no property description was attached when Wahid executed it, with these subissues:

19

(a) Whether the statute of frauds allowed the contract to be orally modified;

(b) Whether sufficient evidence supported the submission of a jury question asking if Wahid was estopped from asserting that the deed did not convey the 701 Property to Shmaisani; and

(c) Whether sufficient evidence supported the jury's finding that Wahid had ratified the conveyance of the 701 Property to Shmaisani;

2. The evidence was legally and factually insufficient to establish that Simone violated CPRC Section 12.002;

3. The lift-stay order in Simone's bankruptcy case was not so broad as to allow the trial court to award monetary damages or attorneys' fees against her;

4. Simone cannot be tagged with Rule 13 sanctions when Smith sought them only against Wahid; and

5. Shmaisani failed to segregate his attorney's fees.

Wally's five issues overlap with Simone's to varying degrees:

1. The trial court abused its discretion by overruling Wally's jury-charge objections;

2. The Wahid–Shmaisani conveyance was void for lack of a legal description or, alternatively, for an erroneous legal description, with three subparts:

(a) Wahid and Shmaisani had no meeting of the minds about modifying the contract;

(b) The evidence was not legally or factually sufficient to show that Wahid ratified the contract; and

(c) The evidence was not legally or factually sufficient to show that Wahid was estopped from challenging the contract's validity or that he waived his right to do so;

3. Shmaisani did not meet his Section 12.002 burden with legally or factually sufficient evidence and is thus not entitled to a judgment against Wally;

20

4. The trial court erred by entering a take-nothing judgment on Wally's counterclaims; and

5. Because Shmaisani's Section 12.002 claim fails, Shmaisani is not entitled to attorney's fees; alternatively, Shmaisani failed to segregate his fees as required.

Because of their commonalities, we will discuss certain issues together.

## STANDARDS OF REVIEW

We may sustain a legal-sufficiency challenge—that is, a no-evidence challenge—only when (1) the record bears no evidence of a vital fact, (2) the rules of law or of evidence bar the court from giving weight to the only evidence offered to prove a vital fact, (3) the evidence offered to prove a vital fact is no more than a mere scintilla, or (4) the evidence establishes conclusively the opposite of a vital fact. *Shields v. Ltd. P'ship v. Bradberry*, 526 S.W.3d 471, 480 (Tex. 2017); *see also Ford Motor Co. v. Castillo*, 444 S.W.3d 616, 620 (Tex. 2014) (op. on reh'g); *Uniroyal Goodrich Tire Co. v. Martinez*, 977 S.W.2d 328, 334 (Tex. 1998) (op. on reh'g). In determining whether legally sufficient evidence supports the finding under review, we must consider evidence favorable to the finding if a reasonable factfinder could, and we must disregard contrary evidence unless a reasonable factfinder could not. *Cent. Ready Mix Concrete Co. v. Islas*, 228 S.W.3d 649, 651 (Tex. 2007); *City of Keller v. Wilson*, 168 S.W.3d 802, 807, 827 (Tex. 2005). We indulge "every reasonable inference deducible from the evidence" in support of the challenged finding. *Gunn v. McCoy*, 554 S.W.3d 645, 658 (Tex. 2018).

Neither Simone nor Wally preserved factual-sufficiency complaints for appeal as we explain later, so we do not recite that standard of review.

A trial court abuses its discretion if it fails to analyze the law correctly or misapplies the law to established facts, *In re Dawson*, 550 S.W.3d 625, 628 (Tex. 2018) (orig. proceeding) (per curiam); *Iliff v. Iliff*, 339 S.W.3d 74, 78 (Tex. 2011), or if its decision is so arbitrary and unreasonable that it amounts to a clear and prejudicial error of law. *In re Olshan Found. Repair Co., LLC*, 328 S.W.3d 883, 888 (Tex. 2010) (orig. proceeding).

We review claims of jury-charge error for an abuse of discretion. *See Thota v. Young*, 366 S.W.3d 678, 687 (Tex. 2012) ("We review a trial court's decision to submit or refuse a particular instruction under an abuse of discretion standard of review."); *Matlock Place Apartments, L.P. v. Druce*, 369 S.W.3d 355, 382 (Tex. App.—Fort Worth 2012, pet. denied). When the appellant challenges an instruction or definition as legally incorrect, we review the instruction or definition de novo. *Matlock Place*, 369 S.W.3d at 382. If the charge is legally correct, the trial court has broad discretion in submitting questions, definitions, and instructions. *Id.*

DISCUSSION

*Simone's Issue 1/Wally's Issues 1 & 2*

**A. The April 2, 2012 Wahid–Shmaisani deed was not incurably void; the parties agreed that the legal description for the 701 Property could be added later, and it was.**

Wahid and Shmaisani signed a real-estate contract that, at Simone's insistence, referred to property by an instrument number only. Simone told Newman not to bother looking up that number online. When closing attorney Smith, who did look it up, became puzzled because the instrument number's associated deed didn't match any property on the Healy foreclosure list, Newman added—with the buyer's and seller's knowledge and in their presence—the imperiled 701 Property addresses to the contract. When Wahid signed the warranty deed that day, no property description was included or attached; Smith added it later and then recorded the deed with an Exhibit A that described the 701 Property. Although conflicting, the trial testimony indicated that Smith did so with both Wahid's and Shmaisani's blessing, and the jury agreed.

Simone and Wally argue that the deed was void when it was executed because it lacked a property description. *See* Tex. Bus. & Com. Code Ann. § 26.01(b)(4); Tex. Prop. Code Ann. § 5.021. Accordingly, they contend, the trial court should not have even asked the jury whether Wahid and Shmaisani had agreed that Smith could add the property description; nothing could animate a void deed, they say, so Question 1 was an incorrect statement of the law.

If the issue was simply whether the deed was valid when executed, the answer would be no. *See* Tex. Bus. & Com. Code Ann. § 26.01(b)(4); Tex. Prop. Code Ann. § 5.021; *AIC Mgmt. v. Crews*, 246 S.W.3d 640, 645 (Tex. 2008) (holding that valid conveyance of real property must contain sufficient description of property). The deed's validity would thus have been a purely legal matter for the trial court to determine. But Shmaisani presented evidence that he and Wahid had agreed that the title company could add an Exhibit A that would describe the 701 Property.

The evidence and the jury's answer to Question 1 place this case squarely within the holdings of cases like *Foster v. Lessing*, 346 S.W.2d 939 (Tex. App.—Waco 1961, writ ref'd n.r.e.), which recognize that a seller or grantor can authorize someone to add descriptions later to cure an initial and otherwise fatal defect.

In *Foster*, a specific-performance case, the jury found that the parties had authorized a real-estate agent to add a legal description to their signed contract after a survey was completed. The appellate court affirmed the trial court's resulting judgment, holding that the reneging seller could not invoke the statute of frauds to invalidate the contract after the agent added the description. *Id.* at 942–43. That is, because the evidence established the parties' authorization to the agent, the later-added description converted an initially unenforceable contract into an enforceable one:

> The contracts as prepared and signed, and containing no description of the land involved were not so wholly void that they were not thereafter

24

operative and effective by the insertion, if authorized by the seller, of a correct description of the land intended to be sold.

*Id.* at 942. *Foster* also supports the trial court's submission of Question 1, which asked:

> Did Wahid Yammine and Issam Al Shmaisani agree on April 2, 2012 that Sharon Smith was authorized to add the legal description of "The Property" (see Definition No. 1) as Exhibit "A" to the General Warranty Deed (dated April 2, 2012) after she completed the title work after the closing on April 2, 2012 for filing of the deed in the public deed records?

The jury answered yes, just as the *Foster* jury did in response to a substantively identical question. *Id.* at 942–43. On our facts, Question 1 was entirely proper.

Like here, the issue in *Foster* "was not whether the writings contained an adequate description of the property, but whether the statute of frauds could be invoked after the initial writings . . . were later supplemented to include descriptions sufficient for statute of frauds purposes." *Lawler v. Dixtor Int'l, Inc.*, No. 05-97-00286-CV, 1999 WL 588097 at *3 (Tex. App.—Dallas Aug. 6, 1999, no pet.) (not designated for publication). If evidence shows the parties' agreement to add a property description after a deed is executed, the deed as augmented is valid and conveys real property. *Foster*, 346 S.W.2d at 942; *cf. Republic Nat'l Bank of Dallas v. Stetson*, 390 S.W.2d 257, 261 (Tex. 1965) (holding that deed lacking description when it was executed conveyed nothing, where undisputed evidence showed that grantor "gave no authority to anyone to fill in the description or alter the document"); *Glasscock v. Farmers Royalty Holding Co.*, 152 F.2d 537, 538–39 (5th Cir. 1945) (holding that parties' stipulation—that grantor had executed two mineral deeds lacking property

descriptions but with the understanding that grantees could later insert descriptions on grantor's authority—established that deeds were "title[-]passing instruments and passed title to the minerals in question," as the trial court found, thereby making it unnecessary to determine separate ratification argument). Indeed, the *Glasscock* court observed what had long been true even in 1945:

> Whatever may be the state of the law [] elsewhere as to whether a deed which has been signed in blank, authority and specific direction being given to the grantee to fill in the descriptive data, is operative or inoperative, it has been many times declared by the Texas courts that such a deed, after the description has been properly filled in, would be operative to pass title[.] *Threadgill v. Butler*, 60 Tex. 599[, 600–01 (1884)]; *Tarrant County v. McLemore*, Tex. Sup., 8 S.W. 94[, 96 (Tex. 1888)].

*Id.* (footnotes omitted).

The jury here faced competing views of what the parties did and didn't agree to on April 2, 2012. It resolved those differences in Shmaisani's favor, in the process making the weight and credibility determinations that are a jury's exclusive province. *See Golden Eagle Archery, Inc. v. Jackson*, 116 S.W.3d 757, 761 (Tex. 2003) (holding that factfinder is the sole judge of the witnesses' credibility and the weight to be given their testimony). Moreover, none of the Yammines argued to the trial court—or to us—that the evidence was legally or factually insufficient to support the jury's finding of an agreement that the 701 Property legal description could be added after closing.[11] *See In*

---

[11]Wally and Wahid filed a JNOV motion combined with a motion to disregard jury findings in which they argued that Question 1 "{i} is not supported by Plaintiff's pleadings and {ii} constitutes a legal conclusion and an improper statement of the law." They contended that if the trial court relied on the jury's answer to Question 1

*re M.S.*, 115 S.W.3d 534, 547 (Tex. 2003) (noting that Rule 324(b)(2) requires a motion for new trial to preserve factual-sufficiency complaint); *T.O. Stanley Boot Co. v. Bank of El Paso*, 847 S.W.2d 218, 220–21 (Tex. 1992) (explaining that a no-evidence issue must be preserved by moving for an instructed verdict, moving for judgment notwithstanding the verdict, objecting to submitting the question to the jury, moving to disregard the jury's answer to a vital fact question, or moving for a new trial). Thus, to the extent that Simone or Wally tacitly complains that legally or factually insufficient evidence supported the answer to Question 1, they have waived that complaint.[12]

Wally raises a related subissue arguing that there was no meeting of the minds between Wahid and Shmaisani about modifying the contract by Newman's inserting the 701 Property addresses or by Smith's adding Exhibit A. He also argues that a valid contract modification must be supported by consideration, citing *White v. Harrison*, 390 S.W.3d 666, 674 (Tex. App.—Dallas 2012, no pet.). Wally did not raise these

---

in rendering a judgment, the court "would improperly find that a written contract to sell real estate could be orally modified and that the oral modification of the written contract was enforceable." This contention is not the same as one that challenges evidentiary sufficiency. *See* Tex. R. App. P. 33.1(a)(1); *Banda v. Garcia*, 955 S.W.2d 270, 272 (Tex. 1997) (holding that complaint on appeal must match that presented in trial court).

[12]Simone was the only defendant to move for a new trial, but her new-trial motion contained no specific grounds, stating only that she "re-urge[d] the points raised in the post-judgment motions and responses and ask[ed] the Court to grant her a new trial in this case."

specific arguments in the trial court, although we suppose that arguing no meeting of the minds at this stage might theoretically be tantamount to complaining that the jury should not have been asked, or should not have answered yes to, Question 1. *Cf. Musallam v. Ali*, No. 02-16-00282-CV, 2019 WL 1950179, at *8 (Tex. App.—Fort Worth May 2, 2019, no pet.) (mem. op. on remand) (rejecting argument that jury should not have been asked whether parties had agreed to certain terms; although whether an agreement constitutes a contract is generally a legal question, "when a meeting of the minds is contested, determination of the existence of a contract is a question of fact"). We have already resolved the Exhibit A issue in Shmaisani's favor; the balance of Wally's subissue has been waived.[13] *See* Tex. R. App. P. 33.1(a)(1)(A); *Banda*, 955 S.W.2d at 272.

In short, by finding an agreement that Smith could add an Exhibit A describing the 701 Property, the jury effectively revived the warranty deed, thereby justifying the trial court's judgment decreeing that Shmaisani owns the 701 Property.

### 1. With the jury's "yes" answer to Question 1, Questions 2 through 4 became immaterial to the final judgment.

Although it could have, the trial court did not condition the jury's answering Question 2 (Wahid's ratification), Question 3 (Wahid's waiver), or Question 4 (Wahid's estoppel) upon answering "no" to Question 1. That is, finding an agreement

---

[13]Regardless, Wally was a stranger to the contract, and we have serious concerns in any event about whether a stranger to a contract can assert that the contracting parties did not have a meeting of the minds.

consisting of "X" does not need belt-and-suspenders findings that a party also later ratified the agreement for X by doing Y, or waived a challenge to its validity, or is estopped from denying its validity. Once a jury finds that parties agreed to something, that agreement is enforceable unless the opposing party has some legal excuse for avoiding it. *See, e.g.*, Tex. R. Civ. P. 94 (listing examples of affirmative defenses). Here it was Shmaisani, not Wahid, who pleaded these three affirmative "defenses" as supplements to his live petition, apparently as alternative ways to obtain a judgment that Shmaisani owned the 701 Property in case the jury declined to find that Wahid and Shmaisani had affirmatively agreed to let Smith add Exhibit A.

For example, even if the jury had answered Question 1 "no," Wahid could nonetheless have ratified the conveyance to Shmaisani by Wahid's assigning the purchase option to Wally or by attempting to exercise the original option himself, because both the assignment and the option contract identified the 701 Property and necessarily recognized that Shmaisani owned it. *See Reserve Petroleum Co. v. Hodge*, 213 S.W.2d 456, 457–58 (Tex. 1948) (holding that by executing mineral lease referring to "mineral deeds properly executed and now of record," mineral owners had ratified conveyance even though earlier mineral deeds lacked property descriptions when signed and owners had not authorized adding descriptions to deeds before they were recorded); *see also Glasscock*, 152 F.2d at 540 (approving trial court's finding that, because deeds were effective to pass title, determining the question of later ratification through grantor's executing a lease was unnecessary, but nevertheless concluding that

grantor's entering into lease constituted ratification and noting "settled law in Texas that the execution by the grantor in questioned instruments of later instruments, recognizing the prior instruments as valid and effective, operates as a complete ratification and validation of them, whether as originally executed they were void or voidable").

Because we affirm the trial court's judgment based on the Question 1 finding, we need not consider Simone's and Wally's arguments concerning the ratification, waiver, and estoppel findings in Shmaisani's favor. Those findings were not material to the judgment. *See Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994) (noting that answer to a jury question is immaterial "when it was properly submitted but has been rendered immaterial by other findings").

### 2. Wally's charge-related complaints fail.

In his first issue, which overlaps somewhat with his second, Wally complains that the trial court erred in overruling his jury-charge objections to Questions 1, 4, and 7. To preserve error about an incorrect jury question or instruction, the complaining party must timely and plainly make the trial court aware of the complaint and obtain a ruling. *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 43–44 (Tex. 2007); *State Dep't of Highways & Pub. Transp. v. Payne*, 838 S.W.2d 235, 241 (Tex. 1992) (op. on reh'g); *see* Tex. R. Civ. P. 274.

The record shows that although Wally and Wahid objected jointly to Question 1 (authority to add Exhibit A) as an "improper statement of the law" and to Question

7 (Shmaisani as a good-faith purchaser) as "not a controlling issue" and as "immaterial," only Wahid objected to Question 4 (estoppel). The defendants did not adopt one another's charge objections, so to the extent we might otherwise be called upon to consider Wally's complaint about Question 4, we need not do so. *See Wolfe v. Devon Energy Prod. Co.*, 382 S.W.3d 434, 451 (Tex. App.—Waco 2012, pet. denied) (observing that if a party did not make its own objections in the trial court and did not adopt another party's objections, "it is foreclosed from relying on the objection of another party to preserve its complaint for appellate review"). In any event, as we explained above, the estoppel finding was immaterial to the eventual judgment.

As for Question 1, Wally argues as he did at the charge conference that it was an improper statement of the law. For the reasons we have already explained, the question was proper. *See Foster*, 346 S.W.2d at 942–43.

Finally, Wally assails Question 7—in which the jury found that Shmaisani was a good-faith purchaser for value without notice of Wahid's (later-recorded) April 2 conveyances to Wally and BW Construction—as immaterial to the case's outcome, surplusage, and a comment on the weight of the evidence. Wally cites no authority for and does not analyze these assertions. *See* Tex. R. App. P. 38.1(i) (stating that "brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record"); *Hamilton v. Williams*, 298 S.W.3d 334, 337 (Tex. App.—Fort Worth 2009, pet. denied) (noting that appellate court will not consider an appellant's issue where appellant fails to provide legal argument in

31

support). Nor does Wally explain how the trial court might have reversibly erred by including Question 7. To obtain reversal of a judgment based on trial-court error, an appellant must show that the error occurred and that it probably caused rendition of an improper judgment or probably prevented the appellant from properly presenting the case to this court. Tex. R. App. P. 44.1(a); *Romero v. KPH Consolidation, Inc.*, 166 S.W.3d 212, 225 (Tex. 2005). Wally has not made the requisite showing.

We overrule Simone's first issue and Wally's first and second issues.

### *Simone's Issue 3*

**B. The bankruptcy court terminated the automatic stay unconditionally and thus allowed money damages and attorneys' fees to be assessed against Simone.**

Simone argues in her third issue that the bankruptcy court terminated the automatic stay of this litigation only so that the trial court could determine title and possession issues, characterizing the order as "lifting the stay of state court activity for the limited purpose of 'any future actions taken by [Shmaisani] to exercise [his] rights to ownership or to obtain exclusive possession of the Real Property.'" As a result, Simone contends, the trial court erred by entering a judgment against her on anything other than ownership and possession issues—that is, Shmaisani cannot recover Section 12.002 damages or associated attorney's fees from her. We disagree with Simone's interpretation.

Section 362(d) of the Bankruptcy Code authorizes a bankruptcy court to grant relief from the automatic stay "such as by terminating, annulling, modifying, or

32

conditioning" the stay. 11 U.S.C.A. § 362(d). "We strictly construe an order modifying the automatic stay." *Dickinson v. Dickinson*, 324 S.W.3d 653, 656 (Tex. App.—Fort Worth 2010, no pet.) (discussing bankruptcy-court order modifying stay to allow divorce to be finalized for specific itemized matters); *see also Stephens v. Hemyari*, 216 S.W.3d 526, 529 (Tex. App.—Dallas 2007, pet. denied) (strictly construing order conditionally lifting stay to allow foreclosure on specific date and holding that creditor failed to establish as matter of law that foreclosure that occurred the following month did not violate automatic stay).

But the order at issue here, entered after an evidentiary hearing, did not "modify" or "condition" the stay—it terminated the stay so that Shmaisani's case could proceed. *See* 11 U.S.C.A. § 362(d) (using "terminating, annulling, modifying, or conditioning" disjunctively). The order allowed Shmaisani "to pursue state court litigation in a matter entitled Issam Al Shmaisani v. Wahid J. Yammine, et al[.], 348-264569-13 and related, *inter alia*, to the real property described below"—the 701 Property. The language used is broad and does not purport to limit Shmaisani's causes of action or remedies to purely nonmonetary or title-related ones. As our sister court in Austin has noted, "[i]n ordinary use, 'relates to' means to have a connection with, to refer to, or to concern. . . . The terminology 'relates to' is very broad in its ordinary usage . . . ." *Tex. Dep't of Pub. Safety v. Abbott*, 310 S.W.3d 670, 674–75 (Tex. App.—Austin 2010, no pet.) (construing "relates to" language in statute in accordance with ordinary use); *see also O'Banion v. Inland W. Clear Lake Gulf Shores GP, LLC*, No. 01-15-

33

00704-CV, 2017 WL 5494695, at *10 (Tex. App.—Houston [1st Dist.] Nov. 16, 2017, no pet.) (mem. op.) (broadly construing court decree requiring party to indemnify another for debts, etc. "in relation to" particular business and noting that "[t]he phrase 'relates to' is recognized as 'very broad' in scope," citing numerous cases). By lifting the stay for litigation "related to" the 701 Property, the bankruptcy court thus expanded rather than cabined what Shmaisani might be able to claim, prove, and recover when it came to issues involving the 701 Property.[14] And if the court had simply ended the sentence after giving the cause number, its intent would have been equally clear.

We are similarly unpersuaded by Simone's argument that the order's second part—terminating the stay also "with respect to any future actions" taken "to exercise [Shmaisani's] rights to ownership or to obtain exclusive possession of the Real Property"—lifted the stay only as to nonmonetary relief and is the decretal language that matters. The second decretal paragraph is untethered from the one allowing the pending litigation to proceed without conditions. Reading the order in its entirety and considering its express terms and plain language, its most salient feature is that the

---

[14]The parties have focused their attention on arguing over what the "*inter alia*" in the lift-stay order meant. To us, because "related to" is broad to begin with, adding "*inter alia*" simply reinforces that the stay was lifted so that Shmaisani could pursue his 701 Property-related claims—whatever they were. We are particularly confident in how we read the order considering that Shmaisani's Section 12.002 and attorneys'-fee claims against Simone (and Wally) had been on file for three months before Simone filed bankruptcy and for six months when the stay was lifted.

stay was lifted for Shmaisani to pursue state-court litigation related to the 701 Property without restricting the type of judgment the state court might enter. The follow-on paragraph authorizing Shmaisani to take "any future actions" hews more closely to the idea that he might eventually need a writ of possession or similar postjudgment assistance and could take such steps without coming back to the bankruptcy court.

We overrule Simone's third issue.

*Simone's Issue 2/Wally's Issue 3*

## C. Evidence abounded that both Simone and Wally violated CPRC Section 12.002(a), the Fraudulent Lien Act.

In their respective second and third issues, Simone and Wally argue that the evidence was legally and factually insufficient to support the jury's answers to Questions 9(b), (c), and (d) (finding CPRC Section 12.002(a) violations on both their parts). Because neither Simone nor Wally moved for a new trial, we need not consider factual sufficiency, *see In re M.S.*, 115 S.W.3d at 547, and will instead ask whether more than a scintilla of evidence existed that either Simone or Wally violated the Act. Keeping in mind that we indulge "every reasonable inference deducible from the evidence" in support of the challenged findings, *Gunn*, 554 S.W.3d at 658, the answer is yes.

The elements of a claim for a fraudulent lien or claim against real property are that a person (1) makes, presents, or uses a document knowing that it is a fraudulent

claim against real property; (2) intends that the document be given legal effect; and (3) intends to cause physical, financial, or mental or emotional injury to another person. *See* Tex. Civ. Prac. & Rem. Code Ann. § 12.002(a); *Brewer v. Green Lizard Holdings, L.L.C. Series SR*, 406 S.W.3d 399, 403 (Tex. App.—Fort Worth 2013, no pet.); *Preston Gate, LP v. Bukaty*, 248 S.W.3d 892, 896–97 (Tex. App.—Dallas 2008, no pet.).[15] Here, the jury was instructed on these elements and found in answer to Questions 9(b) and (c) that Wally fraudulently caused to be filed two documents—the late-in-the-day April 2 warranty deeds from Wahid to Wally and to BW Construction—and fraudulently executed and caused to be filed a third document— the W. Yammine July 2012 trustee's deed. In answering Question 9(d), the jury found

---

[15]Section 12.002(a) provides:

(a) A person may not make, present, or use a document or other record with:

(1) knowledge that the document or other record is a fraudulent court record or a fraudulent lien or claim against real or personal property or an interest in real or personal property;

(2) intent that the document or other record be given the same legal effect as a court record . . . , evidencing a valid lien or claim against real or personal property or an interest in real or personal property; and

(3) intent to cause another person to suffer:

(A) physical injury;

(B) financial injury; or

(C) mental anguish or emotional distress.

36

that Simone fraudulently executed and caused to be filed one document—the deed conveying Lots 1 through 6 to her trust after she acquired Wahid's real-estate portfolio from his bankruptcy estate. As a result of those findings, the trial court awarded Shmaisani the statutory maximum of $10,000 per fraudulent filing, for a total of $30,000 against Wally and $10,000 against Simone. *See* Tex. Civ. Prac. & Rem. Code Ann. § 12.002(b)(1)(A) (providing that a person who violates the Act is liable for the greater of $10,000 or actual damages caused by the violation).

### 1. Evidence of Simone's Section 12.002 violation.

Simone claims that the evidence shows nothing more than that *someone* filed the October 2014 deed from her to her trust. The deed recites that the trust's mailing address is P.O. Box 11781 in Fort Worth; the deed was submitted for recording by the 701, 705, & 709 N Main Street Trust; and the address to which the deed was to be returned after recording was P.O. Box 11781. Not only is this the same post-office box Simone used for herself in recording Wahid's August 2012 option-exercise notice, but in her appellate brief she affirmatively represented that she in fact filed this deed in December 2015.

She next claims that even if she filed it, there was no evidence that she knew the deed was fraudulent. But the jury heard from Simone that the deed conveyed Lots 1 through 6 of the 701 Property to the trust; that she had known since 2012 that Wahid had conveyed those lots to Shmaisani; and that she had testified under oath in Wahid's bankruptcy proceeding that Shmaisani had acquired Lots 1 through 6. The

37

fact that the bankruptcy court approved the trustee's sale to Simone of Wahid's real-estate holdings, allegedly including Lots 1 through 6, is irrelevant in the face of her superior knowledge, especially since the bankruptcy court effectively threw up its hands in the approval order by explicitly disavowing any determination that Wahid owned *any* of the listed real-property interests.[16] Simone acknowledged that she knew in October 2014 what the bankruptcy court's order said in that regard.

As for intent to cause injury, the third element, we start with the overarching principle that "[i]ntent is a fact question uniquely within the realm of the trier of fact because it so depends upon the credibility of the witnesses and the weight to be given to their testimony" and "invariably must be proven by circumstantial evidence." *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 434, 435 (Tex. 1986). *See also Consol. Reinforcement, L.P. v. Cheraif*, No. 04-18-00443-CV, 2019 WL 2272890, at *2 (Tex. App.—San Antonio May 29, 2019, no pet.) (applying *Spoljaric* in Chapter 12 context). Because Simone, on Wahid's behalf, had tried to exercise the option to repurchase the 701 Property and filed a notice to that effect on August 2, 2012, she knew in October

---

[16]Simone's theory seems to be that she cannot have violated the Act because she "believed she was a bona fide purchaser [BFP] for good value because she purchased the property from the bankruptcy trustee." More than a scintilla of evidence negates the idea that Simone was a BFP. *See, e.g., Madison v. Gordon*, 39 S.W.3d 604, 606 (Tex. 2001) (noting that to receive special protection as BFP, "one must acquire property in good faith, for value, and without notice of any third-party claim or interest"); *Aston Meadows, Ltd. v. Devon Energy Prod. Co.*, 359 S.W.3d 856, 859 (Tex. App.—Fort Worth 2012, pet. denied) (reciting that notice sufficient to defeat BFP status may be actual or constructive and that actual notice "rests on personal information or knowledge").

38

2014 that Wahid did not own that property despite her disingenuous argument that laundering it through Wahid's bankruptcy trustee cured all ills. That fact, combined with her obfuscating the entire April 2012 transaction by giving Newman what was really a decoy instrument number for the contract, is more than a scintilla of evidence that Simone intended to cause injury to Shmaisani. Had Simone's and her brothers' legerdemain succeeded in putting the 701 Property back into Yammine hands, Shmaisani would have paid $535,000 for exactly nothing—and thus been financially injured—as this exchange suggests:

> Q. [Shmaisani's counsel] -- once again, the question is: My client paid $535,000 at closing. Your family got the benefit of paying off the Healy liens. You're claiming an interest in the property. Your brother Wally is claiming an interest in the property. What did my client get for his $535,000?
>
> A. [Simone] I don't have an answer.[17]

Simone relies heavily on a Chapter 12 case from our sister court in Dallas concerning legally insufficient evidence of intent to cause injury. *Aland v. Martin*, 271 S.W.3d 424 (Tex. App.—Dallas 2008, no pet.). That case held that a husband could not recover under the Act after his wife's divorce lawyer placed a lien against community property to secure payment of fees and failed to remove the lien at the husband's request. *Id.* at 432–33. The appellate court looked at the evidence as a

---

[17]Wahid's lawyer took the position that because Wahid had been discharged in bankruptcy, Wahid "had nothing he could give back" to Shmaisani if the deal was unwound.

whole and concluded that it was "equally consistent" with both an intent and a lack of intent on the lawyer's part to cause injury. *Id.* at 433 (noting that "[w]hen the circumstances are equally consistent with either of two facts, neither fact may be inferred") (quoting *City of Keller*, 168 S.W.3d at 813). "The final test for legal sufficiency must always be whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *City of Keller*, 168 S.W.3d at 827.

Here, in view of Simone's cagey explanations, and deferring as we must to the jury's weight and credibility assessments, we cannot agree that intent versus lack of intent were anything like reasonably equivalent options on this record. The facts more closely resemble those of such cases as *Brewer v. Green Lizard Holdings* and *Bernard v. Bank of America. See Brewer*, 406 S.W.3d 399; *Bernard v. Bank of Am.*, No. 04-12-00088-CV, 2013 WL 441749 (Tex. App.—San Antonio Feb. 6, 2013, no pet.) (mem. op.). In *Brewer*, we affirmed summary judgment for Green Lizard, which had purchased a lot at a delinquent-tax sale only to discover that Brewer was occupying the property under a deed purportedly given him by a representative of the former owner. *Brewer*, 406 S.W.3d at 401. Brewer had also filed a mechanic's lien on the property for services ostensibly rendered after he recorded the deed. *Id.* In holding that Green Lizard had established all elements of its Chapter 12 claim—including intent to injure—as a matter of law, we recapped the evidence this way:

40

Appellee [Green Lizard] presented evidence that a corporate officer of the entity from which appellant [Brewer] purported to take his title to the property had no knowledge of appellant and that the entity never conveyed [the] property to appellant. The deed appellant recorded in the property records is dated before the foreclosure [on the lender's deed of trust from the former owner] but was not recorded until several months later. . . . Nor did he provide any evidence that he filed the documents to protect a legitimate interest in the property. Additionally, the mechanic's lien and certificate of acknowledgement were both filed . . . the day before the tax sale.

*Id.* at 404. *Bernard* involved defaulting homeowners who, after receiving notice of the bank's scheduled foreclosure sale, executed and filed a "substitution of trustee" document reflecting that the Bernards, not the bank, were the deed of trust's beneficiaries and purporting to name a substitute trustee. 2013 WL 441749, at *1. Relying on that document, the Bernards then sought an injunction to stop the bank's foreclosure and succeeded in dragging things out in court before the bank finally won summary judgment on its Chapter 12 counterclaim. *Id.* at *4. Affirming, the San Antonio court noted that the Bernards' unilaterally drafting, signing, and filing the "substitution of trustee" document to stop the foreclosure, coupled with their failing to pay their mortgage "for nearly two years while still residing in the home, demonstrate[d] an intent to cause the Bank financial harm." *Id.* Additionally, there was "nothing in the record to suggest that the Bernards filed the 'Substitution of Trustee' document to legitimately protect their property interests." *Id.*

Similar to Brewer's and the Bernards' shenanigans, we find nothing here to suggest any intent *other* than to harm Shmaisani through (a) Simone's purchase of

41

Wahid's alleged real-property assets, including some of the 701 Property, from the bankruptcy trustee over a year after Shmaisani had sued Wahid, (b) Simone's immediate transfer of that property to her trust in October 2014 (a transfer not recorded until December 2015), or (c) her vague testimony about title having somehow returned from the trust to her with the assistance of some lawyer whose name she could not recall. As in *Brewer* and *Bernard*, none of this evidence points to an intent to legitimately protect Simone's (or her brothers') property interests; Simone knew that Shmaisani had bought the 701 Property, but she nevertheless executed and filed a deed transferring part of that property to a trust she controlled.

The evidence of Simone's Section 12.002 violation is legally sufficient, and we overrule her second issue.

## 2. Evidence of Wally's Section 12.002 violations.

Wally's combined JNOV motion and motion to disregard jury findings argued only that there was no evidence that Wally had "filed or caused to be filed the Warranty Deed documents conveying" a half interest in the 701 Property to Wally and Lots 5 and 6 to BW Construction, or that he had "fraudulently executed or caused to be filed" or "prepared or filed" the W. Yammine trustee's deed. In his appellate briefing, Wally has added a new argument: that there was no evidence that he "intended to cause financial injury to anyone."[18]

---

[18]Unlike Wahid, Wally did not raise a no-evidence argument in the trial court on the intent-to-injure element, even though Wahid and Wally jointly filed their

42

At trial, Wally claimed to recall virtually nothing about the two warranty deeds or the trustee's deed. Concerning the April 2012 deed to Wally of the half interest, Wally each time responded "I don't remember" when asked if he had submitted the document for filing (as the document reflects on its face, showing as it does "Wally Yammine" as the "Submitter"). Wally gave the same response when asked why he had waited until October to file it. As for the deed to BW Construction, "I don't remember" was also the word-for-word answer to questions about the "circumstances surrounding the execution of [that] document" and "why [he] waited until October 31st of 2012 to file this document after it was purportedly executed in April." The "Submitter" shown on this deed was Wally's dba, BW Construction. Notably, Wally never denied having filed the two deeds.

Wally similarly "d[id]n't remember" if it was his signature on the July 2012 trustee's deed, whether he had "ever been a trustee associated with a deed of trust," or where that document—which, like the warranty deeds, was notarized—had come from.

---

postverdict motion. Their specific attacks on the jury's answers to Questions 9(a), (b), and (c) were personalized, and each brother's attack was substantively different from the other's. *See Dupree v. Piggly Wiggly Shop Rite Foods, Inc.*, 542 S.W.2d 882, 892 (Tex. App.—Corpus Christi 1976, writ ref'd n.r.e.) (op. on reh'g), (*disapproved of on other grounds, Fifth Club, Inc. v. Ramirez*, 196 S.W.3d 788 (Tex. 2006)) (setting forth elements required in motion to disregard findings, including "specify[ing] the reason why the finding or findings should be disregarded"). Although Wally has thus not preserved this particular complaint, we would conclude that the evidence of intent to injure was legally sufficient for the same reasons as in our analysis of Simone's Section 12.002 issue, above.

Q. [by Shmaisani's counsel] All right. Mr. Yammine, let me ask you this: This document, this trustee's deed that we have in Exhibit 18, that reflects that somebody by the name of W. Yammine held a foreclosure sale . . . on July 3rd of 2012 and sold the property at foreclosure to New Frontier Financial. Do you have any recollection of acting as a trustee and attempting to sell property at a foreclosure sale to New Frontier Financial on July 3rd, 2012?

A. [Wally] I don't remember, Mr. Parrish.

Again, this is not a denial.

The jury had before it various exhibits signed by Wahid, who was the only other candidate to be "W. Yammine,"[19] and could easily contrast those signatures with the one on the trustee's deed. In fact, Wahid agreed that the "W. Yammine" signature on the trustee's deed was not his own, but when asked if it was Wally's, Wahid said only that he wasn't sure. The jury also heard Joseph respond, "I don't remember" when he was asked, in connection with that deed, whether he had ever executed a deed of trust in favor of Wally that was secured by the property; like Wahid, Joseph couldn't identify Wally's signature. The jury also heard from Newman that Wally knew and understood that the entire 701 Property was being sold to Shmaisani and that Wally never said otherwise in later meetings with Newman. The jury also knew that Wahid had assigned the option to repurchase the 701 Property to

---

[19]Wally was asked if he knew "anybody else [other than himself and Wahid] not related to the family that goes by W. Yammine" and responded, "I'm not sure. I haven't looked up anybody else."

44

Wally and that that option—another document Wally couldn't remember—was notarized and recorded.

In contrasting Wally's (indeed, all the Yammines') near-constant memory failures with the contents of recorded, notarized instruments, the jury was well within its rights to answer "yes" to Questions 9(b) and (c). *Cf. Thomas v. Bobby D. Assocs.*, No. 12-01-00361-CV, 2002 WL 1429821, at *2 (Tex. App.—Tyler June 28, 2002, pet. denied) (not designated for publication) (affirming denial of postdefault new-trial motion where record contained proper return of service and noting that where appellant's affidavit statements were "contradictory as, in one instance, he denies being served with citation, but in another, states that he cannot remember being served with citation," the trial court, as judge of weight and credibility issues, was free to resolve inconsistencies); *see also* 3A J. Wigmore, Evidence § 1043 at 1061 (Chadbourn rev. 1970) (observing, in context of impeaching forgetful witness with prior statements, that "the unwilling witness often takes refuge in a failure to remember, and the astute liar is sometimes impregnable unless his flank can be exposed to an attack of this sort").

We overrule Wally's third issue.

**D. Wally did not preserve error regarding his counterclaims, nor did he put on any evidence to support them.**

In his fourth issue, Wally argues that the trial court erred by entering a take-nothing judgment on his counterclaims against Shmaisani to quiet title, for real-estate fraud, and for violations of the Texas Theft Liability Act. Wally waived his fourth issue by failing to request a jury question on his counterclaims, by failing to preserve error about any such omissions from the charge, and by failing to seek a ruling from the court on his counterclaims as a matter of law. *See* Tex. R. App. P. 33.1(a)(1)(A); *Raymax Mgmt., L.P. v. SBC Tower Holdings LLC*, No. 02-16-00013-CV, 2017 WL 3821897, at *3 n.11 (Tex. App.—Fort Worth Aug. 31, 2017, pet. denied) (mem. op. on reh'g) (noting that party waived ability to recover on particular claim when party "failed to request a jury question on that cause of action in the court's charge and to preserve error regarding its omission from the charge, or to obtain a ruling from the court on the claim as a matter of law"). In fact, when expressly given the chance to tell the jury what he was claiming, Wally punted: "I have to read the -- my petition. I don't have it with me now." Wally never put on evidence of his counterclaims.

We overrule Wally's Issue 4.

**E. Smith is not entitled to recover Rule 13 sanctions from Simone.**

In her fourth issue, Simone argues that the trial court erroneously awarded sanctions in the form of attorney's fees to Smith. We agree.

Smith filed a postjudgment motion for sanctions against Wahid. In its final judgment, the trial court ordered that "Sharon Smith's Rule 13 Motion for Sanctions [be] granted and that Sharon Smith recover from Simone Barron the sum of $21,265 as reasonable and necessary attorneys' fees." Simone points out that Smith did not seek sanctions against Simone and so this aspect of the judgment has no pleadings to support it. Smith has not filed a brief with us nor otherwise appeared in this appeal, and the record offers no basis on which to affirm the award.

We sustain Simone's fourth issue and reverse and render this part of the trial court's judgment.

## *Simone's Issue 5/ Wally's Issue 5*

**F. Shmaisani failed to segregate his attorney's fees, and we cannot tell how the trial court arrived at the amount of fees it awarded.**

In their fifth and final issues, Simone and Wally challenge the trial court's award of attorneys' fees to Shmaisani under Chapter 12. *See* Tex. Civ. Prac. & Rem. Code Ann. § 12.002(b)(3) (providing that a "person who violates Subsection (a) . . . is liable to each injured person for . . . reasonable attorney's fees"). Because we have upheld the jury's findings and affirmed the resulting judgment that Simone and Wally

violated the Act, Shmaisani is entitled to recover his reasonable attorneys' fees. But we must remand this issue to the trial court because the record does not support the amounts awarded.

During trial, the parties announced their agreement to submit the issue of attorneys' fees postverdict. In accordance with that agreement, Shmaisani later submitted his attorney's affidavit, a supplemental affidavit, and billing records. In all, Shmaisani requested $265,811 in fees from Wahid, Wally, and Simone, jointly and severally. The trial court's eventual judgment awarded Shmaisani $120,000 in reasonable and necessary attorney's fees under Chapter 12 from Wally and $40,000 from Simone, for a total of $160,000. The trial court also awarded conditional appellate attorneys' fees in differing amounts.

Several weeks after it entered judgment, the trial court prepared and filed findings of fact and conclusions of law. The trial court's findings of fact read, in their entirety:

> The equivalent jury findings, had the matter been submitted to a jury, would have been submitted substantially as follows:
>
> What is a reasonable fee for the necessary services of Issam Al Shmaisani's attorney incurred for the prosecution of his claim against Walid 'Wally' Yammine for which you answered 'yes' in answer to Question 9c, stated in dollars and cents:
>
> Answer with an amount for each of the following:
>
> 1.  For representation through trial and the completion of the proceedings in the trial court:

Answer: $120,000

2. For successful representation through appeal to the court of appeals:

Answer: $16,000

3. For successful representation through the Supreme Court:

Answer: $8,000

4. The Court makes these findings as its Findings of Fact regarding reasonable and necessary attorneys' fees pursuant to Tex. Civ. Prac. & Rem. Code, section 12.002(b)(1)(B)(3) [sic].

There were no similar findings made in connection with the fee award against Simone, and we do not have a reporter's record of any postverdict hearing.

The attorneys'-fee awards have several problems that necessitate a remand. First, the trial court appears to have simply quadrupled the Chapter 12 $10,000-per-violation statutory penalties against Wally and Simone in arriving at its attorney's-fee amounts—but Chapter 12 calls for an award of "reasonable" fees, not one tied in some way to the statutory penalty. *See* Tex. Civ. Prac. & Rem. Code Ann. § 12.002(b)(3). Second, the $120,000 that would result from multiplying Wally's three Chapter 12 violations by $40,000 doesn't mesh with the trial court's finding of fact that refers only to Question 9(c), which involved only one of Wally's three fraudulent filings. Third, although the billing records predate by many months the addition of Simone and Wally as defendants, we can find nothing to suggest that Shmaisani or the trial court attempted to carve out any fees from that earlier time. Fourth, attorneys'

49

fees are not recoverable for any of Shmaisani's non-Chapter 12 causes of action (to quiet title or, alternatively, for trespass to try title), so Shmaisani either had to segregate his recoverable from his nonrecoverable fees or show that his claims were so intertwined as to make segregation not reasonably possible. *See Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 311–13 (Tex. 2006) (discussing obligation to segregate fees unless claims are intertwined); *Poag v. Flories*, 317 S.W.3d 820, 828–29 (Tex. App.—Fort Worth 2010, pet. denied) (noting that attorneys' fees are not recoverable in title-related suits).

In response to Wally's (and Wahid's) opposition to Shmaisani's motion for attorneys' fees, Shmaisani asserted that the claims "were so intertwined that they could not be segregated" and that "[e]ven if the Court were persuaded that some segregation should have been made, the aggregate amount of attorney's fees is some evidence of what the segregated amount should be." Shmaisani then asked the trial court to determine the appropriate amount. Neither the judgment nor the findings of fact and conclusions of law, however, mentioned whether the fees should have been segregated and, if so, how the trial court arrived at an appropriate amount out of the roughly 250 pages of billing records. *Cf. 4922 Holdings, LLC v. Rivera*, No. 14-19-00922-CV, 2021 WL 1745384, at *12 (Tex. App.—Houston [14th Dist.] May 4, 2021, no pet. h.) (deferring to trial court's award where party's "concerns about double billing and hours billed for unrecoverable post-trial work [were] addressed by the trial court's findings of fact, wherein the court reduced the hours billed and removed

50

potential double billing issues" after the trial court "combed through Obialo's invoice, reducing many of the hourly amounts reflected, removing all hours reflected for services connected with Rivera's claims against 4922 Holdings, and reducing by half the amount billed for paralegal hours," citing *El Apple I, Ltd. v. Olivas*, 370 S.W.3d 757, 763 (Tex. 2012)). The trial court here does not seem to have engaged in such analysis. In addition, Shmaisani's attorneys'-fee affidavits do not include evidence of the *Arthur Andersen* factors that were reaffirmed in *Rohrmoos Venture v. UTSW DVA Healthcare, LLP*, 578 S.W.3d 469, 494 (Tex. 2019), and without which "the fact finder has no meaningful way to determine if the fees sought are in fact reasonable and necessary." *Id.* (citing *Arthur Andersen & Co. v. Perry Equip. Corp.*, 945 S.W.2d 812, 818–19 (Tex. 1997)).

We sustain Simone's and Wally's fifth issues, reverse the trial court's awards of attorneys' fees, and remand the fee issue for a new trial.

### *Simone's Additional Complaints*

### G. Lacking any analysis at all, Simone's concluding kitchen-sink complaints are inadequately briefed and borderline frivolous.

The final section of Simone's opening brief, consisting of one seven-line paragraph and no citations to authorities, mentions three things she claims warrant a new trial. First, Simone cites to two pages of the record in asserting that she had objected to a particular juror's continuing to serve. Those record citations are not only flat wrong, but the trial court specifically stated that "if anybody wants to move to

51

excuse [the juror in question] and use the alternate, now is your time to do it." Getting no response, the trial court followed up with, "All right. There are no takers." Next, Simone asserts that a mistrial should have been granted after Newman allegedly referred to Shmaisani's attorneys' fees being paid by Stewart Title, but she gives us no record citation either to such testimony or to any mistrial motion. Finally, Simone asserts that a proposed jury question was wrongly excluded from the charge.[20]

Although arguing the substance of an appellate complaint within the body of a brief can overcome a failure to list it as an issue presented, a party must still do some actual analysis. *See* Tex. R. App. P. 38.1(f), (i); *Baumgart v. Archer*, 581 S.W.3d 819, 827 n.5 (Tex. App.—Houston [1st Dist.] 2019, pet. denied) (noting that the court would consider appellant's evidence of defamation discussed in body of brief even though appellant did not challenge trial court's finding on Texas Citizen Participation Act claim in his list of issues); *Hamilton*, 298 S.W.3d at 337 (noting that appellate court will not consider issue where appellant fails to provide legal argument in support). Simone made zero effort to explain why any of these three alleged errors should entitle her to a new trial, so to the extent we might consider these as issues raised, we overrule them.

---

[20]Simone's proposed question was, "Did Issam Al Shmaisani fraudulently alter the deed through his lawyer, Michael Newman, after April 2, 2012?" The trial court denied her request.

## CONCLUSION

Having sustained Simone's fourth issue, we reverse and render the trial court's award to Sharon Smith of $21,265 from Simone. Having sustained Simone's and Wally's fifth issues, we reverse the award of attorneys' fees to Shmaisani and remand those issues to the trial court for a new trial. In all other respects, we affirm the trial court's judgment.

/s/ Elizabeth Kerr
Elizabeth Kerr
Justice

Delivered: June 3, 2021